**A. R. C. INDUSTRIES, INC.,**
Appellant

v.

**STATE of Alaska, Appellee.**

**STATE of Alaska, Cross-Appellant,**

v.

**A. R. C. INDUSTRIES, INC.,**
Cross-Appellee.

**Nos. 2344, 2345.**

Supreme Court of Alaska.

July 2, 1976.

---

Leroy J. Barker, Robertson, Monagle, Eastaugh and Bradley, Anchorage, for appellant and cross-appellee.

Dorothy Awes Haaland, Asst. Atty. Gen., Anchorage and Avrum M. Gross, Atty. Gen., Juneau, for appellee and cross-appellant.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and BURKE, Justices.

## OPINION

BURKE, Justice.

A.R.C. Industries, Inc., (A.R.C.) appeals from the judgment of the superior court denying its claim for additional compensation for extra work required in the performance of a construction contract. The State of Alaska has filed a cross-appeal,

contending that the superior court lacked proper jurisdiction to hear the matter and that the court's award of costs to A.R.C. was improper.

The case was tried without a jury. We are asked to review certain findings of fact which A.R.C. attacks as clearly erroneous.[1]

On May 26, 1972, a contract was executed between the State of Alaska, Department of Public Works, Division of Waters and Harbors, and A.R.C. for the construction of a weir on Eyak Lake, near Cordova, Alaska. A weir is a structure designed to impede or regulate the flow of water, but not completely block the flow as does a dam. Payment and performance bonds, which were conditions precedent to commencing work under clause 2.03[2] of the contract, were executed on June 21, 1972. The contract required completion of all work on the project by September 15, 1972. The completion date was later extended by the state at the request of the contractor, by two change orders; the final completion date was to have been October 2 or 5.[3]

The weir to be constructed was designed by a licensed civil engineer employed by the State of Alaska. The weir was designed to allow water to pass over its entire length most of the year. When the water was at its lowest anticipated level, it would pass through a rectangular notch in the center of the weir. The notch was intended to allow the passage of small fishing and pleasure boats through the weir.

The weir was to be constructed at the southern end of Eyak Lake, at the point of confluence of Eyak Lake, to the north, and the Eyak River, to the south. There is a highway bridge at that location. The water flows in a southerly direction and the weir was to be built about 190 feet north (upstream) of the bridge. The weir was to be built across the entire lake; the distance from the east shore to the notch is about 160 feet, and from the notch to the west bank about 200 feet.

The contract plans and specifications consisted of two pages. The first page was a map of the State of Alaska which indicated the location of Cordova and the project site. The second page provided a sketch of the proposed weir and information regarding the depth of the water at various points and the location of the proposed weir. The plans did not specify the method or means by which, or location at which, the contractor was to effectuate closure [4] of the weir.

Following acceptance of its bid and award of the contract on May 26, 1972, A.R.C. began mobilizing its equipment and materials on June 15, 1972. However, A.R.C. workers did not arrive in Cordova until July 28, 1972, following preliminary work and planning in Anchorage. The driving of pile, which involved the installation of the metal sheets forming the weir, commenced on August 6, 1972.

Although a number of construction alternatives were available, A.R.C. selected a method whereby work was initiated on one

1. Rule 52(a), Alaska Rules of Civil Procedure, provides in part:
   In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon . . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . .

2. *Clause 2.03 Bid and Contract Award:* The contract will be awarded to the bidder submitting the lowest bid. Notice to Proceed will be issued concurrently with notifi-

cation of award (within 30 days after the bid opening date) with the provision that it is contingent upon signing of the construction contract and satisfactory execution of the required bonds and insurance.

3. There is some confusion regarding this date. Records of the State of Alaska and correspondence between the state and A.R.C. appear to be in conflict. This discrepancy, however, is not material to our decision.

4. Closure is the process of completing the installed weir. As the weir is constructed, more and more of the river is blocked. The blockage directs greater quantities of water through

side of the lake and proceeded directly across to the other side. Closure was anticipated on the side opposite A.R.C.'s starting point. A.R.C. first installed a rock blanket, as required by the contract, on the east shore line. Soil and water conditions necessitated the rock blanket in this area to provide rigidity and stability to the weir. A.R.C. then proceeded across to the other side of the lake, putting the metal sheets partially into place. While construction progressed, the weir was lashed to a work bridge used by A.R.C.'s crew to install advancing sections of the weir. The sheet pilings which made up the weir were pre-cut, several days ahead of time, to the length shown on the plans and specifications. Once the sheet pilings were cut, there was no way to lengthen them.

The state assigned one of its employees to the construction site as the project engineer. Notes from the project engineer's log indicate that by September 9, 1972, the water level on Eyak Lake was high and that the rainy season had set in. By September 12, 1972, three days later, construction of the weir had proceeded to within 90 feet of the west shore line at which point closure was anticipated. When placing the metal sheets in place, A.R.C. found some of the riverbed soils to be less stable, and the water in some places to be deeper, than was indicated in the plans and specifications supplied by the state. A.R.C. did not, however, request a change order for longer pilings or indicate to the project engineer that construction was at all jeopardized by these conditions.

The night of September 12, 1972, brought heavy rains to the Cordova area. The rains raised the level in Eyak Lake to such a degree that work on the weir was halted for one week; the weir was completely submerged. Of the forty sections of piling which had been partially driven

into place by the afternoon of September 12, 1972, ten or twelve sections were pushed out of position by the storm. When A.R.C. workers were finally able to return to work they restored the line of pilings to its proper shape and position and proceeded with the insertion of new sheets into the soil, again working towards the closure point on the shore. They found that the high water, and the resulting increased flow of water past the weir, had caused considerable scouring[5] of the riverbed soils. When the A.R.C. crew reached the bank where closure of the weir was intended, it found that the bottom of the lake had been scoured to a degree which prevented the successful placement of the final sheets of the weir into position. The pre-cut pilings were too short to be driven to a depth which would insure the necessary stability and integrity of the weir. As a temporary measure, the weir was lashed to the work bridge used by the crew and the weir remained uncompleted while the situation was assessed.

In the latter part of September, 1972, A.R.C. workers and the state's project engineer took depth soundings to determine how much material had been eroded from around the base of the weir on both the upstream and the downstream sides. At this time the sheet metal wall, which comprised the weir, was diverting the entire flow of the lake against a steep bank on which the state highway was located. Such a large volume of water, moving with great velocity through the relatively narrow unclosed portion of the weir, was cutting deeply into the bank, endangering the highway. The piling needed for closure of the weir would not reach the bottom of the lake and A.R.C. was short of steel.

It was critical that the flow of water through the unclosed section of the weir be

the increasingly narrow section of the weir which is still open. Closure involves the installation of the final sections of the weir, which redirects the flow of water over the top of the entire weir.

5. Scouring occurs when the flow of water lifts particles, rocks, and soil from the bottom of a stream or river. Scouring requires a waterflow of sufficient volume and velocity to pick up and carry away the material.

halted, as the highway would remain in jeopardy until the current was diverted over the top of the completed weir. With the state's concurrence, A.R.C. used 1,335 cubic yards of rock [6] to fill the scoured out area and provide a sufficiently stable base in which to install the remaining sections of the weir.

The state formally accepted the Eyak Lake Weir Project [7] as having been satisfactorily completed on November 2, 1972.

Pursuant to a liquidated damages provision in the contract with A.R.C., the state withheld $2,300 from the final contract price paid A.R.C.[8]

Following completion of the project, A.R.C. sought compensation from the state for the cost of installing the additional rock bed required to support the weir. A.R.C. contended that under the sections of the contract which governed changed conditions [9] it was entitled to compensation

6. There is conflict concerning the quantity and quality of the rock used. A.R.C. refers to this rock as "rip-rap" which is rock of a certain quality and size used for such construction purposes. Rip-rap, apparently, is more costly than ordinary material. The state disputes the fact that rip-rap was used. We concur with the trial court that the question of whether the rock used was actually rip-rap is irrelevant to the outcome of this case.

7. State Project No. 6–72417.

8. Clause 2.04 of the contract provided for liquidated damages in the amount of $100 per day for each day construction extended past the agreed completion date. The state, somehow, determined that the project was completed 23 days late although this figure does not correspond with their amended completion date or the date on which the state assumed beneficial occupancy.

9. *Clause 1.25 Changed Conditions:* The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of:
(a) Subsurface or other conditions differing materially from those contemplated under the contract, or—
(b) Unknown physical conditions at the site, of an unusual nature and differing materially from those ordinarily encountered and generally recognized as inherent in character of the work provided for in this contract. The Contracting Officer will promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for performance of this contract, an equitable adjustment will be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder will not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify consider and adjust any such claim asserted before the date of final settlement of the Contract. If the parties fail to agree upon the adjustment to be made, the dispute will be determined as provided in Clause 1.28 and 1.29 hereof.
*Clause 1.26 Changes and Extra Work:*
(a) The Contracting Officer may make any changes in the drawings, specifications, character, or quantities of work as may be necessary or desirable during the performance of this contract.
(b) The Contracting Officer may order the performance of any "Extra Work" which might be required. "Extra Work" will include all work that is not covered by a specific contract payment item and which differs substantially from that on which the Contractor bid.
(c) Should any contract item be deleted in its entirety, payment will be made only for actual costs incurred prior to notification of such deletion.
(d) All Change Orders will be in writing and will state the work to be changed or accomplishment and the method, the dollar value or estimated dollar value of the change, any adjustment in contract time, and will provide for the Contracting Officer's and the Contractor's signature and acceptance.
(e) The Contractor must prosecute, without delay, all changes and extra work indicated by a change order. Compensation will be in accordance with this clause and clause 1.27 of these General Provisions.
(f) The quantities of items shown on the Bid schedule are estimates only and no adjustments in unit price may be claimed by either the Contractor or the Contracting Officer for changes in the final contract quantities unless the total value of all such changes, both additive and deductive, exceeds 25% of the Contract bid price. No Change Order will be issued or considered necessary for changes in quantities under the context of this paragraph.
(g) The Contract time will be increased in the same proportion as the cost of the additional work bears to the original work, if the changes or extra work warrants and requires additional time to complete the contract.
See also contract clauses 1.27 and 1.28, Plaintiff's Exhibit No. 6a.

for the extra work required. Clause 1.29 of the contract provided a procedure by which disputes were to be resolved. Pursuant to this clause, a Board of Review hearing was held on April 12, 1973, to review A.R.C.'s claim for compensation. The Board recommended payment of costs established and substantiated by A.R.C. for placing 800 cubic yards of material in position. A.R.C. filed a claim for payment of $62,916.20 on May 17, 1973. The Commissioner of Public Works rejected this claim by letter on May 30, 1973, stating that the amount was totally unacceptable and that "a settlement of three to four thousand dollars would seem appropriate".

On January 17, 1974, A.R.C. filed this action in the superior court. The trial court found that the state had failed to establish a satisfactory basis to justify liquidated damages in any specific amount. Thus, judgment was ordered for the plaintiff, A.R.C., for $2,300, the amount previously withheld by the State.

Regarding the extra work for which A.R.C. sought compensation, the trial court found as follows:

That A.R.C. had the option of selecting the exact location of the weir within certain limits and, additionally, had total discretion over the location and method of closure;

That the contract suggested a pre-site inspection by the contractor before submitting his bid to familiarize himself with the local conditions;

That there was a change in the nature and character of the stream bed which resulted in insufficient soil to support the final sheets of the weir, and that this condi-

tion was created by the contractor for several reasons:

(1) Construction extended into the rainy season, which increased the volume and velocity of the water from the lake, a factor that was foreseeable to and considered, but ignored, by the contractor;

(2) The location and method of closure selected by A.R.C. increased the velocity of the water by restricting the flow;

(3) The increased volume and velocity of the water, caused by (1) and (2) above, changed and scoured the existing river bed so as to lessen its ability to support the weir.

Accordingly, the trial court denied A.R.C.'s claim for extra work and compensation.

In reviewing the trial court's findings, we are bound by the standard of review set out in Rule 52(a).[10] The clearly erroneous standard was defined in *Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co.*, 482 P.2d 842 (Alaska 1971), in which we stated:

A finding is clearly erroneous when, although there may be evidence to support it, we are left with the definite and firm conviction on the entire record that a mistake has been committed.[11]    482 P.2d at p. 848

■ A.R.C. has alleged that three[12] of the trial court's findings of fact were clearly erroneous. We shall examine each challenged finding in turn.

I. EFFECT OF THE RAINY SEASON ON CONSTRUCTION

■ A.R.C. contends that the trial court's findings of fact concerning the ex-

---

10. See note 1, *supra*.

11. *See also A & G Construction Co., Inc. v. Reid Brothers Logging Co., Inc.*, 547 P.2d 1207 (Alaska 1976); *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826 (Alaska 1974).

12. The State has contended that A.R.C.'s failure to specifically enumerate the issue of "defective design" of the weir in its statement of points on appeal, filed pursuant to Rule 9(e), Alaska Rules of Appellate Procedure, bars it raising the issue on appeal. We find that the appellant's Rule 9(e) statement impliedly, albeit inarticulately, raised the design defect issue.

tension of construction into the rainy season were clearly erroneous. The court found that the seasonal rains resulted in a rise in the river which was foreseeable to A.R.C. and that this condition was considered, but ignored, by the contractor. The court found that the change in the stream bed which resulted in insufficient soil to support the weir was caused, in part, by the effect of the rains on the lake and the construction project.[13]

After a careful review of the evidence adduced at trial, we are unable to say that the trial court's findings on this issue were clearly erroneous. Testimony of Thomas G. Farr, President of A.R.C., supports the trial court's conclusion that fall is the rainy season in Cordova and that this was foreseeable and known to the contractor. Under cross-examination Mr. Farr stated:

Q: Did it rain any more any other times during the year than others?

A: Oh yes, the fall season it rained, spring seasons, were lots of rain and lots of wind.

\* \* \* \* \* \*

Q: But isn't it true, Mr. Farr, that you can expect to experience certainly some—some rain—(during the fall).

A: Storms, uh-hmm.

The evidence also supports the trial court's finding that construction extended into the rainy season. The weir was only partially in place when the September 12 storm struck Cordova and flooded Eyak Lake and the construction project. The construction notes of Mark Halvorsen, the State's project engineer, entered into evidence, indicate that by the first week in September the lake was already "high" and that the rainy season had set in.

The testimony of Mr. Farr permits the inference that the high water caused by the September 12 flood resulted in a change in the river bed's ability to support the weir. Again under cross-examination, Mr. Farr stated:

Q: Now, was there any difference, did you notice any difference, Mr. Farr, in the river bottom after the flood as it was—as opposed to before the flood?

A: At the end of the forty sheets, there was less material at the bottom of the river, as we went towards shore, why there was a lesser amount of material there for about 30 feet.

Q: Now the, in point of fact, Mr. Farr, this high water that came along, this flood, created considerable scouring, did it not?

A: Yes, it did, uh-hmm.

Finally, the trial court found that the extension of construction into the rainy season was ignored by the contractor. The contract between the state and A.R.C. was executed on May 26, 1972. A.R.C. was free to commence construction immediately thereafter. Mr. Farr acknowledged in his testimony that fall presents wet weather problems in the Cordova area. With this in mind, A.R.C. had apparently recognized the need to complete the weir as early as possible. On cross-examination Mr. Farr

---

13. The trial court's findings of fact numbers (13) and (15) concerned the effect of the rainy season. They provided:

(13) I find that the seasonal rains caused a rise in the river creating a greater volume of water, all of which was foreseeable to the contractor and further, that the partial blocking of the river by the existing weir created a substantial increase in the velocity and volume of this water flowing between the highway embankment and the end of the uncompleted weir.

(15) I find that there was a change in the nature and character of the stream bed which resulted in insufficient soil to support the final sheets. I find that this condition was created by the contractor for several reasons.

(1) Construction extended into the rainy season, all of which was foreseeable and considered, but obviously ignored by the contractor. The end result was a substantial increase in the waterflow to the extent that the dam already being constructed was being overflown [sic] by three or four feet of water.

\* \* \* \* \*

was questioned on A.R.C.'s concern about the possible weather problems:

Q: But isn't it true Mr. Farr, that you can expect to experience certainly some—some rain—(during the fall).

A: Storms, uh-hmm.

Q: Right. Now didn't your progress schedule take that into consideration, Mr. Farr?

A: Yes, uh-hmm.

Q: All 'right. And when did your progress schedule show that you were going to have your piling installed?

A: By mid-August.

Despite its recognition that the fall would present weather hazards, A.R.C. failed to mobilize its workers and equipment with dispatch. The payment and performance bonds, which were conditions precedent to commencing work, were not executed until nearly a month after execution of the contract. Workers did not arrive at Cordova until July 28, 1972, and the driving of pile did not commence until August 6, 1972. Thus, there was a sufficient factual basis from which the trial court could have reasonably concluded that, despite its recognition of the hazards posed by the oncoming fall weather, A.R.C. delayed in marshalling its equipment and workers.

While the contract between A.R.C. and the state originally called for completion of the weir by September 15, 1972, the con-tract was executed by the parties at a point in time which left the contractor the entire summer in which to complete construction. The September 15 completion deadline was an "outside" date. We cannot say that the trial court was clearly erroneous in concluding that the extension of construction into the rainy season, and the complications resulting thereby, were chargeable to A.R.C.

## II. SELECTION OF THE CLOSURE METHOD AND LOCATION

A.R.C. has also challenged the trial court's findings of fact regarding closure of the weir. The court found that A.R.C. had chosen the location, method, and means of closure of the weir; and that there were problems associated with closure, including an increase in the volume and velocity of water proceeding past the partially completed weir, resulting in scouring of the riverbed soils and a weakening of the structure.[14] Our review of the record reflects a substantial basis for these findings; accordingly, we are unable to agree with the appellant that the trial court's findings were clearly erroneous.

The plans provided by the State of Alaska did not indicate the method by which the weir was to be closed. The state's design engineer testified that closure was left to the contractor's option so as to permit a variety of contractors, each with different equipment and capabilities, to competitively bid on the project. The design engineer also outlined the various ways in which

---

14. The trial court's findings of fact No. 12 and No. 15 concerned closure of the weir. They stated:

. . . . .

I find that the contractor had the option of selecting the exact location [of closure] within certain limits. . . . I find that the actual construction techniques to be used on the weir were the contractor's option. [I] Also find that the site where the weir was constructed has on one bank a highway which created a sharp bank. On the other bank the area is flat and gradually dissipates into swampy area. I find that the contractor commenced construction on the

opposite bank of the highway embankment and elected to close from the beginning on the embanked side.

\* \* \* \* \*

I find there was a change in the nature and character of the stream bed which resulted in insufficient soil to support the final sheets [of piling]. I find that this condition was created by the contractor for several reasons.

. . . (2) Closure site itself further increased the velocity of the water by channeling and restricting the flow within the embankment and the incompleted weir.

\* \* \* \* \*

closure of the weir could have been effectuated:

One method would be to start in the middle of the stream, putting the sheet piling in this case to grade, and working toward both sides, which gives you—divides up the stream into two locations. Another method would be to make the closure in the middle of the stream, starting from both ends, working towards the middle, leaving the natural channel unimpeded. Other methods are to pave the entire length of the weir with suitable material that will possibly not scour or erode, especially in the area where the closure might be made; the contractor should prepare the closure by protecting it from scour; he should marshall his equipment and forces and materials to—and have backup facilities to make the closure as quickly as possible to decrease the time that scour can occur. You can plug the gap with a prepared—in this case, you could weld ten or fifteen sheets together and place them as a plug in the final closure, and he should also pick the location of the closure to eliminate as many of the attendant problems as might occur.

A.R.C.'s president, Mr. Farr, acknowledged that A.R.C. had selected the method and means of closure, and that the selection was based on the available equipment and materials. Mr. Farr also testified that A.R.C. had selected the location at which closure was to be made knowing that the water velocity would increase as larger and larger quantities of water were forced through the ever narrowing gap in the weir. Just prior to the September 12 flood there were two or three days of work remaining on the weir; thus, at the time of the flood A.R.C. was nearly ready to effectuate closure. Mr. Farr testified about the results of the flood:

Q: Now, what happened as a result of that high water which made it so

that it took longer than two or three days to make this closure?

A: Well, we went in and we—first we had to wait for the water to recede; we waited over a week, and then when we resumed operations, we were picking up our gear and preparing to go back out into the river and do the additional driving needed. Meanwhile, the water was getting lower each day, and we had to stand the wall up again and start our driving process.

Q: Now, also as a result of this high water, there was scouring of the stream bed?

A: Yes, there was; at the end of the last piling that we put in, there was scouring around them.

It was not unreasonable for the trial court to conclude that the scouring which occurred was due, in part, to the location and method of closure selected by the contractor; that had the contractor chosen another form of closure the September 12 flood would not have resulted in the heavy scouring of the stream bed soils. After reviewing the evidence we are not left with a definite and firm conviction that an error was committed by the trial court.

## III. DEFECTIVE DESIGN OF THE WEIR

Finally, A.R.C. contends that the trial court's findings of fact on the issue of defective design of the weir itself were clearly erroneous. The court stated, in Finding of Fact No. 11:

I find that there was no faulty design in the plans and specifications provided by the State.

In essence, A.R.C. argues that since it complied fully with the specifications of the plans provided by the state, any failure in the weir must have resulted from flaws in the state's plans. A.R.C. relies on a line of cases derived from *U. S. v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918) [15]

15. *See also Christie v. United States*, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *Natus Corp.*

which holds that plans and specifications provided by the state constitute an implied warranty that if they are complied with, the structure will be adequate. Were A.R.C.'s argument factually well-based we might be persuaded to apply the rule enunciated in the *Spearin* cases.

As noted in the previous section of this opinion, we are unable to find that the trial court was clearly erroneous in concluding that the collapse of the weir was caused by the location and method of closure selected by A.R.C. Since the plans and specifications provided by the state were silent on the matter of closure, and since A.R.C., alone, selected the location and method of closure, it would not appear that the state breached even an implied warranty. In leaving closure to the contractor, there were no misrepresentations made to A.R.C. by the state. Accordingly, we do not find clear error here.

## IV. CROSS-APPEAL

The state has raised by way of cross-appeal three matters which we consider briefly.

■■■■ First, the state contends that A.R.C. failed to properly aver the superior court's jurisdiction over the state. We find that the superior court did have such jurisdiction in this matter by virtue of AS 09.50.250.[16] To the extent that Rule 9(a), Alaska Rules of Civil Procedure, requires the plaintiff to allege capacity and cite the appropriate statute in its complaint, A.R. C.'s failure to do so was procedural and harmless in nature. A.R.C. need only amend its complaint to include the citation of the jurisdictional statute. Indeed, we are permitted, on motion of the court, to amend the complaint so long as the evidence at trial provides a sufficient basis.[17] We hereby so amend the complaint and move on to the state's second contention.

■■■■ Second, the State claims that A.R.C.'s failure to exhaust its administrative remedies deprived the superior court of jurisdiction. We find that A.R.C. did exhaust the administrative procedures provided for in the contract[18] in submitting its claim first to the contracting officer and appealing to the Board of Review. The state also contends that A.R.C. was not entitled to a trial de novo but that the appeal to the superior court should have been held on the record made before the state Board of Review. AS 22.10.020[19] permits the trial court, in its discretion, to grant a trial de novo on appeals from an administrative

*v. U. S.*, 371 F.2d 450, 178 Ct.Cl. 1 (U.S.C.C. 1967); *Laburnum Construction Corporation v. United States*, 325 F.2d 451, 163 Ct.Cl. 339 (1963).

16. AS 09.50.250 provides:
   *Actionable claims against the state.* A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court. A person who may present his claim under AS 44.77.010–44.77.060 may not bring an action under this section except as set out in AS 44.77.040(c). However, no action may be brought under this section if the claim
   (1) is an action for tort, and is based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation is valid; or is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

the part of a state agency or an employee of the state, whether or not the discretion involved is abused;
   (2) is for damages caused by the imposition or establishment of a quarantine by the state;
   (3) arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

17. *Nordin Construction Company v. City of Nome*, 489 P.2d 455 (Alaska 1971).

18. Contract clause 1.29 governed resolutions of disputes.

19. AS 22.10.020 *Jurisdiction.* (a) . . . The hearings on appeal from a final order or judgment of a[n] . . . administrative agency shall be on the record unless the superior court, in its discretion, grants a trial de novo, in whole or in part. . . .

agency. Thus, we find no merit in the state's argument.

Finally, the state contends that the trial court's awarding of costs to A.R.C. was improper. While the state's argument may have had merit at one time, the state's delay in raising this issue constitutes a fatal defect. Rule 79(d), Alaska Rules of Civil Procedure, provides:

> *Review by Court.* The action of the clerk in taxing costs may be reviewed by the court at the instance of any party upon motion and notice served not later than 5 days after the costs have been taxed by the clerk. When notice is served, the motion shall particularly designate each ruling of the clerk to which objection is made. Matters not so designated will not be considered by the court. The motion will be heard upon the same papers, affidavits and other documentary evidence used before the clerk, and upon such memoranda as the court may require.

Judgment was filed in the superior court on August 15, 1974. The clerk's taxation of costs was filed on September 6, 1974. The state did not, at any time, file a motion pursuant to Rule 79(d) to contest the clerk's awarding of costs. The matter was raised, for the first time, on appeal to this court.

The state's failure to comply with the notice and motion requirements of the rules of procedure bars its raising the issue at this time. Rule 79(d) was clearly drafted so as to give the trial court an opportunity to correct errors made by the clerk in assessing costs.

Thus, the decision of the superior court is affirmed on all respects.

AFFIRMED.

ERWIN, Justice, not participating.