**CHRIS BERG, INC.**

v.

**The UNITED STATES.**

No. 452–65.

United States Court of Claims.

Jan. 19, 1968.

William L. Hintze, for plaintiff. John C. Hoover, Seattle, Wash., attorney of record and Paul R. Cressman, Seattle, Wash., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWAN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This is in many respects a companion case to S. S. Mullen, Inc. v. United States, Ct.Cl. 389 F.2d 390 decided today. The contract called for much the same kind of performance, in the same part of the world, in support of the same program. The relief sought is the same. Though the general contractors are different, the dispute again relates primarily to work to be performed by the same subcon-

---

\* At the direction of the court, Trial Commissioner C. Murray Bernhardt prepared an opinion which has been of substantial assistance to the court. We reach, however, a contrary result. The case having come before us on the administrative record, no evidence was taken *de novo*. Our fact findings are set forth in the opinion.

tractor, West Coast Steel Co. However, the cases are not consolidated. But a small part of the record in *Mullen*, relating to the qualification of witnesses, was stipulated into the record here. There are significant differences as to the facts, which we hold compel a different conclusion as to the Government's liability. With respect to the instant claim, it has not committed a breach and is not obligated to make an equitable adjustment.

The contract let to plaintiff, hereinafter called *Berg*, in June 1961 (about a year after the *Mullen* contract) called for erection of new aerial tramways of the Riblet type at Cape Newenham and Northeast Cape, to replace old tramways of the single-track Columbia type.

When this opinion does not call attention to fact differences, the reader may assume the facts are the same as in *Mullen*. The dispute here relates to the Cape Newenham job and the other is not hereinafter mentioned. Cape Newenham is 460 miles southwest of Anchorage. The tramway there is, like the one in the *Mullen* case at Tin City, to support operation of a radome, and leads from a lower terminal over seven intervening towers to a hilltop terminal 1,130 feet higher and 4,294 feet away. The original single-track tramway had been built in 1951, and the track cable had averaged under a 4-year useful life, the last previous replacement having been in September 1958. The icing conditions were less severe than at Tin City, but were second only to that unblessed location in that regard.

The contract was generally similar to the one in *Mullen*, but it omitted the Government Furnished Property and Joint Inspection clauses. It permitted use of the existing tramway in the same terms. Plaintiff expected to use the existing tramway as in *Mullen*, to transport 6,000-pound components to the sites of the new towers, which were along the axis of the old. Plaintiff computed its bid on that basis. It made no pre-award site investigation as to any matters here relevant. It expected to accomplish preliminary work in 1961, have the tower components fabricated in Portland, Oregon, and bring them to Cape Newenham by barge for installation in the 1962 construction season. It considered that any method of installation, excluding use of the existing tramway as a "high line" would be more expensive and difficult, particularly in light of the poor access by land to the tower sites.

Mr. Robert McLellan, the engineer and tramway expert who figures in the *Mullen* case, was also retained by the subcontractor in the case at bar. He first visited the Cape Newenham site in July 1961, shortly after the award, and made a "cursory inspection." He noticed the corroded condition of the towers and the cables, unlike anything he had observed at other Alaskan tramways, and concluded that there was something peculiarly corrosive in the Cape Newenham air. He noticed a diameter decrease in the track cable similar to that in the failed cable at Tin City. The traction line was badly corroded and worn, but this was of less immediate significance as it was slated to be—and was—replaced in August. While the distance of 961 feet between two towers at Tin City was an adverse factor there, here a stretch occurred of 1,367 feet. This indicated to him that far less ice thickness would be needed to be "critical." Thereafter, working at other tramways, he built up a lack of confidence in Air Force maintenance methods, particularly the failure, as he saw it, of proper lubrication or greasing of cables to inhibit corrosion.

The contractor in early 1962 asked the defendant to operate the tramway for it during the 1962 construction season, but defendant refused to do so. The legal aspects of this refusal are discussed infra. Realizing it would have to take the tramway over, if it were to carry out its construction plan, it asked Mr. McLellan to inspect the tramway thoroughly, and this he did in April. The result was an unqualified condemnation. Meanwhile the new traction cable had failed and had been spliced, but the principal grounds for rejection were those already noticed

in July. The corrosion of the towers was significant, not as indicating that the towers might fail, but as evidencing the existence of some evil property in the air which might be wreaking destruction on interior strands of the cable which could not be seen.

The defendant, then and through the subsequent proceedings before the Board, maintained that the tramway was perfectly all right. It had its own expert in support of its position. Plaintiff did in fact operate the existing tramway for about six weeks in the construction season, but only on a few occasions and for purposes other than moving or installing most of the 6,000-pound components of the Riblet towers. These it wrestled into place over the inhospitable terrain, at what it says were greatly increased costs.

The case, as in *Mullen*, went under the Dispute article to the ASBCA (Appeal of Chris Berg, ASBCA #8673, 65–1 BCA ¶ 4643).

■■ The Board found that "Appellant's decision not to use the tramway exclusively was a reasonable one." Besides the McLellan testimony, it refers to the fact that the track cable had been used four years in 1962, and that was as long as previous cables had lasted. Also, it found plaintiff was going to use the tramway more frequently and with heavier loads than the Air Force did.

The Board also found:

* * * Nor was the condition of the tramway either unknown or unusual. The condition of the tramway did not change materially from the time of the bid until it was dismantled and its condition was readily ascertained by a site investigation. * * *

These findings are binding on us if supported by substantial evidence, and, unlike similar findings in *Mullen*, we believe they are. There the track cable was relatively new and unless ruptured by ice would no doubt have had a useful life well beyond the construction season anticipated; here it was old. There Mr.

McLellan was alarmed by nothing on his first "cursory inspection;" here only a month after the award he observed signs of serious corrosion which could not but have been present for anyone to see at the time when site inspection should have been made. There Mr. McLellan's objections were primarily to the safety of the jury repair to the ice break in the cable, none of which has existed on the date of award; here he postulated the slow development of the corrosion due to corrosive air and bad maintenance. The Board having elected, as was its right, to believe Mr. McLellan's description of the defects in the tramway, as against the contentions of the opposing experts, the conclusion followed irresistably that the faults existed and could have been found before the award.

This makes it unnecessary for us to consider whether plaintiff should have taken warning from the situation at Tin City, where the dispute over the safety of the tramway had reached a peak of acerbity just about the time the Cape Newenham contract was awarded.

The fact the verbal storm at Tin City was then raging throws pretty clear illumination, however, on what the Engineers meant to accomplish in omitting from the Berg contract the *Government Furnished Property* and *Joint Inspection* clauses, conspicuous in the *Mullen* contract. Lacking these, plaintiff here is forced to put on clauses common to both contracts a weight they will not bear.

Before the Board plaintiff relied on the Changed Conditions clause, which as the Board points out, is not applicable because we are not concerned either with conditions indicated in the contract, or unknown physical conditions at the site.

■■ Both *Mullen* and the case at bar contained the contract specifications U–1–05a.(2), which read:

The existing towers and tramway may be used in erecting the new towers and tramway. The contractor assumes all liability in the use of the existing tramway for erection purposes.

However, in *Mullen,* as is not the case here, the contract also contained a Government Furnished Property clause, which we there held expressly warrants the suitability of the furnished property for its "intended use." Lacking such a clause in its favor, the plaintiff here argues that the law will imply a warranty of fitness for the intended use from the promise to provide a facility for that use, citing Ekco Products Co. v. United States, 312 F.2d 768, 160 Ct.Cl. 75 (1963). Not only is the principle of law the plaintiff sets forth too broad, because the contract at issue did not contain the phrase, as did that in *Mullen,* "suitable for the intended use", but the use of the phrase "may be used", without the co-existence of a Government Furnished Property clause, refers merely to permissive use and not to any specific suitable or intended use. The use of the word "may" has been held not to be a representation by the Government of the nature or quality of the property furnished. See Associated Engineers & Contractors, Inc., ASBCA Nos. 9992–94, 65–2 BCA ¶ 5177 (1965).

*Ekco Products* was a situation much more favorable to the plaintiff, but clearly distinguishable from the case at bar. There the Government furnished manufacturing machines to the plaintiff for its use in making cartridge cases for the Government. Recovery was granted the plaintiff because the machines were not fit for that use. However, there the plaintiff took the trouble, before the contract was entered into, to inspect the property it was to receive. The defendant specifically stated to the plaintiff the condition of that property. We found that an implied warranty as to the fitness of the machines had arisen from the contract arrangement itself because: (1) the essence of the contract was that the plaintiff was to use the Government Furnished Property, that it had to have it for its manufacturing process and that the defendant gave it to plaintiff expressly for that purpose; (2) by telling the plaintiff the nature of the property to be furnished the Government exhibited an awareness of the use the plaintiff intended to make of the machines; and (3) an inspection by the plaintiff would have revealed very little about the machines; not until they were actually integrated into the plaintiff's manufacturing process would their true nature have been revealed. In the case at bar the plaintiff made no pre-award inspection and thereby it bound itself, under the contract site investigation provision, to what it would have discovered had that inspection been made. Nor can it be said that a grant of permissive use goes to the essence of this contract. What the required inspection would have disclosed is discussed supra.

■■ The plaintiff next argued that "Where the Government draws specifications [e. g., U–1–05] which are fairly susceptible of a certain construction and the contractor *reasonably* so construes them, justice and equity require that the construction be adopted." Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). With this statement we do not quarrel. What we do say is that the plaintiff's interpretation of U–1–05a.(2) was not reasonable. (Emphasis supplied.)

■ What we have before us is a contractor who was given permission to use Government property. This use was completely optional on the contractor's part. Having not included in the contract a Government Furnished Property clause, the Government made no warranty or representation as to the property's condition, nor did it obligate itself to maintain that property in such condition as to enable the contractor to use it in any manner it contemplated. In light of what the site investigation would have revealed, the lack of a warranty or representation, and looking to the merely permissive use granted by the Government, which we interpret here as putting upon the plaintiff the risk of determining what use the existing tramway and towers could be put to, it is our view that it would be unreasonable for the contractor to expect the existing tramway to last out the life of the contract in condition to carry 6,000 pound loads. The ASBCA in its decision

that we are here reviewing, found that the "appellant [the contractor] would have used the tramway with much greater frequency and with heavier loads than the Air Force did." Yet, at lighter loads and with less frequency the tramway at Newenham still required repair every four years, on the average. For the plaintiff to have expected the tramway to stand up to its heavier use in better shape than it did to the use the Air Force subjected it to was clearly an unreasonable assumption. And to interpret U–1–05a.-(2) as warranting or representing this result was not a reasonable construction of that specification.

■ The plaintiff is claiming additional compensation on another ground, to wit, that the Government was obligated to operate the tramway as a utility using its own personnel. The Board below held against the plaintiff on this claim. With its decision we agree.

Returning again to specification U–1–05a. (2), it stated:

\* \* \* The contractor assumes all liability in the use of the existing tramway for erection purposes.

Though there is some argument over the nature of the liability plaintiff agreed to assume, this issue need not be resolved now. We hold that it would be unreasonable for us to believe that the plaintiff would be willing to bear the "liability" in operating the tramway, yet at the same time allow Government personnel to do the operating which could bring that liability on. That the plaintiff says it would not only *allow* Government personnel to operate the tramway but would *require* them to do so cannot be. The absence of a "joint inspection" clause is explained by the obvious fact the Government did not want to assume an obligation to plaintiff to maintain the tramway as the clause required, and thus plaintiff was mistaken in attributing the omission to an intent to operate the tramway for plaintiff's benefit.

In sum, the plaintiff's assignment of errors is without merit and the plaintiff's petition is dismissed.