**B-E-C-K CONSTRUCTORS, a joint venture composed of Koon-Boen, Inc. and Cummins-Egge, Inc., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HIGHWAYS, Appellee.**

No. 3610.

Supreme Court of Alaska.

Dec. 21, 1979.

---

Dale R. Martin, Barokas & Martin, Seattle, Wash., Thomas A. Sofo, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellant.

Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellees.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

BURKE, Justice.

In 1971 a state highway bridge across the Copper River collapsed. As a result of the bridge collapse and the consequent loss of access to the work site, B–E–C–K Constructors (BECK) experienced delays and increased costs in its work on other state highway bridges. BECK sued the State of Alaska to recover the extra costs. The superior court granted the State's motion for summary judgment, and we affirm that decision.

Following competitive bidding, BECK was awarded a contract by the State of

Alaska, Department of Highways,[1] to build several new highway bridges across the Copper River. These bridges were to replace existing bridges which had been destroyed or damaged in the 1964 earthquake.[2] In designing the project the State realigned the roadway so that existing Bridge 331 (the bridge which eventually collapsed) would be replaced by two new bridges—new Bridge 331 and Bridge 1187—which would be located 100 feet upstream from old Bridge 331. The contract called for BECK to construct the two new bridges and to demolish old Bridge 331. The contract included no terms relating to the use of old Bridge 331 during the project. The contract, however, did contain descriptions of all existing bridges to be removed under the contract, including old Bridge 331:

> (a) The existing bridges, or remains thereof, to be removed are as follows:
>
> (1) *The existing Copper River Bridge No. 331, a damaged steel and concrete structure* approximately 2437 feet along [sic] and located approximately 100 feet downstream of Centerline from Station 137 + 70 ± to Station 162 + 20 ±. This structure consists of three simply supported steel through trusses with timber decks followed by a trestle system of eighteen steel stringer spans with concrete decks followed by four simple through truss spans with timber decks and terminated by a final trestle system of ten steel stringer spans with concrete decks. The substructure consists of eight massive concrete piers, a concrete abutment and the pile bents for trestle system. [Emphasis added.]

The only other reference to Bridge 331 in the contract appeared in a report which accompanied the bid package. That report, prepared by the Engineering Geology Section of the Department of Highways, included an "engineering analysis" of old Bridge 331:

2. Bridge Foundations

The Copper River and Northwestern Railroad constructed a bridge over the Flag Point channel which is still standing. It was three large piers designed to have both high strength and stability. They were specifically designed to resist large ice forces, etc. (A photo of these piers is enclosed with this report.) According to the Engineering Record description, (1910) the piers are supported on footings approximately 14′ wide and 54′ long. The footing is approximately 2′ thick and supported on 114 timber piles with an average penetration of 36′ into the "sand and gravel of the river bed". This description correlates very well with subsurface data obtained during recent drilling operations. That is, a bearing stratum was encountered between 20 and 40 feet below the river bed in all borings put down at this site. *The piers supporting the railroad bridge do not appear to have undergone any critical settlement since their original construction in 1909. It is also noted that they suffered very little damage during the earthquake of March 27, 1964 which totally destroyed numerous bridges along the Copper River Highway.* [Emphasis added.]

The bid package notified bidders of the availability of other information about old Bridge 331: a 1910 engineering report on the original railroad bridge, contract plans for the trestle portion of the bridge, and shop plans for the structural steel for the truss and trestle portions of the bridge. This notice, however, was accompanied by the following disclaimer:

> The information shown in the above is for information only. It is expressly understood that the State will not be re-

1. Now the Department of Transportation and Public Facilities.

2. The original bridges over the river had been railroad bridges which were built around 1910 and abandoned in the late 1930's. In 1953, when work began on the Copper River Highway, the old railroad bridges were converted to highway bridges. Following the 1964 earthquake, the highway was closed because of damage to the roadway and bridges. In 1967 the State learned it was eligible for federal assistance in repairing earthquake damage to the highway and started making plans for the construction projects.

sponsible for any deduction, interpretation or conclusion drawn therefrom by the contractor. This information is made available so that the contractor may have access to the same information as the State.

Prior to submitting its bid, BECK sent two employees to inspect the work site. According to BECK's project manager, he asked the men to

> look at the bridges, particularly the precast concrete deck span sections . . . because they were damaged, from evidence in the photographs, and to look at them with a view to repairing them for our use in obtaining access across the river, and also to generally look at the major railroad spans to determine what would have to be done to all them for access across the river.

The project manager testified in his deposition that he did not ask the men to inspect the piers under the bridge "[b]ecause from the information that was supplied by the State of Alaska with the bid documents it was my belief that the concrete piers for the major railroad bridges were sound, and there was no need to consider them."

■ After being awarded the contract, BECK started the project in the fall of 1970. It did repair work to the superstructure of Bridge 331 and used the bridge to gain access to the work site on the other side of the channel.[3] On July 21, 1971, while BECK was moving a crane across the bridge, a pier of the bridge collapsed, dropping two spans into the river.[4] Two men died in the accident. BECK's access to the work site across the channel was cut off for about thirty days.

After the State rejected BECK's administrative claim for extra costs, BECK filed this action against the State. Following extensive discovery, the State filed a motion for summary judgment. The superior court granted that motion and subsequently filed a memorandum of decision detailing the rationale for the decision. The court concluded that the State had made no explicit representations that Bridge 331 was suitable for use as a means of access, that the State had not implicitly warranted the integrity of the bridge as a means of access, and that the State had no duty to disclose additional records it had pertaining to the bridge.

■ Final judgment was entered for the State, including an award of $23,000 in costs and attorney's fees. BECK appeals both the decision to grant the State's motion for summary judgment and the award of attorney's fees.[5]

---

3. Other means of access were possible. The project manager testified in his deposition that there were three possible methods of access: a temporary wooden bridge, barges, and access berms. These methods were considered in determining how to gain access to the piers of the new bridge being constructed. The existing bridge was to be used to move equipment and material across the channel.

4. The cause of the bridge collapse is in dispute. BECK, the contractor, contends that the wooden pilings supporting the concrete piers were sheared by the 1964 earthquake and that the bridge collapsed when the pilings failed. The State contends that the bridge collapse was caused by excess scouring of the river bottom brought about by the earth berms constructed by BECK which constricted the river flow to a narrow opening. For purposes of the motion for summary judgment, however, earthquake damage was assumed to be the cause of the collapse. This assumption was required, since "[i]n ruling on a motion for summary judgment all reasonable inferences from the proofs offered are drawn against the moving party, and are viewed in the light most favorable to the party opposing the motion." *Valkama v. Harris,* 575 P.2d 789, 790 (Alaska 1978). *Accord, Champion Oil Co. v. Herbert,* 578 P.2d 961 (Alaska 1978). Otherwise, the court found that there were no genuine issues of material fact and, therefore, considered the case as one fit for a decision on the merits under the state's motion for summary judgment. *Champion Oil Co. v. Herbert,* 578 P.2d 961 (Alaska 1978); *Howarth v. First Nat'l Bank of Anchorage,* 540 P.2d 486, 489 (Alaska 1975), *aff'd on rehearing,* 551 P.2d 934 (1976); *Alaska Rent-A-Car, Inc. v. Ford Motor Co.,* 526 P.2d 1136, 1138 (Alaska 1974).

5. BECK filed its notice of appeal from the judgment on August 23, 1977, and its Statement of Points on Appeal, required by Appellate Rule 9(e), was filed on August 25, 1977. Both of these documents were filed before the court announced its award of attorney's fees on August 30. Consequently, the attorney's fee issue

In order to prevail upon appeal, a party against whom a motion for summary judgment has been granted must persuade this court either that a genuine issue of material fact did exist, *see* Alaska R.Civ.P. 56(c); *Champion Oil Co. v. Herbert,* 578 P.2d 961, 963 (Alaska 1978), or that the moving party was not entitled to a judgment as a matter of law. *See Jennings v. State,* 566 P.2d 1304, 1309 (Alaska 1977). Appellant "need not establish that it will ultimately prevail at trial, but only that there exists a genuine issue of fact to be litigated." *Alaska Rent-A-Car, Inc. v. Ford Motor Co.,* 526 P.2d 1136, 1139 (Alaska 1974). We are of the opinion that no genuine issue regarding any fact material to the subject contract has been specifically set forth by BECK sufficient to withstand the motion for summary judgment.[6]

### I. Misrepresentation

The only description of old Bridge 331 in the contract itself was in a section entitled "Removal of Bridges, Culverts and Other Drainage Structures, General Description." This section explicitly described the bridge as "a damaged steel and concrete structure." BECK, however, bases its claim of misrepresentation on two statements included in documents that accompanied the bid package. We conclude that, in the context in which they were made, the statements do not constitute misrepresentations.

The first alleged misrepresentation is the statement in the bid package that the piers supporting the bridge "suffered very little damage during the earthquake." This statement was in the report of the Engineering Geology Section. Considering the report as a whole, the obvious reason for including this report in the bid package was to provide bidders with information on the soil conditions in the riverbed in connection with the construction of the new bridges. Given the purpose of the report, it is clear that the statement regarding the piers of the bridge was intended to impart information about the stability of the soils in the riverbed and not to warrant the structural integrity of the piers themselves.[7]

The second alleged misrepresentation is the statement in the bid package that the additional information on the existing structures "is made available so that the contractor may have access to the same information as the State." The "existing structures," however, were pertinent to the contract only as structures which were to be *demolished.* In this context, we believe it is clear that the purpose of the "additional data," consisting of an engineer's report and various plans for the steel portion of the bridge, was to assist the contractor in estimating the cost of demolition. Although the State had information in its files pertaining to Bridge 331 that was not

was not originally included in BECK's Statement of Points on Appeal, and BECK has not amended that statement as permitted under Appellate Rule 7(a)(5) to include the attorney's fee issue. Appellate Rule 9(e) provides that "[t]he court will consider nothing but the points so stated [in the Statement of Points]." Since both parties have briefed the issue, however, we will relax the rule and consider the issue. *See* Rule 46, Alaska R.App.P. We note, however, that a party who wishes to appeal an award of attorney's fees entered after the filing of the statement of points should amend the statement to include the fee issue.

6. *Cf., Howarth v. First Nat'l Bank of Anchorage,* 540 P.2d 486, 489–90 (Alaska 1975) ("[o]nce the [movant] made out a prima facie case, [appellant] was required, in order to prevent entry of summary judgment, to set forth specific facts showing that he could produce admissible evidence reasonably tending to dis-

pute or contradict the [movant's] evidence, and thus demonstrate that a material issue of fact exist[s]"). As our discussion, *infra,* demonstrates, the trial court was correct in finding that certain of the relevant, albeit contested, facts presented by BECK were not material to the resolution of appellant's claims, or that, as a matter of law, the material facts could not reasonably admit of dispute. *See generally Braund, Inc. v. White,* 486 P.2d 50, 53–55 (Alaska 1971).

7. Even if the statement were construed as an assurance that the piers were sound, it would not necessarily be a misrepresentation. The statement in the report referred only to the concrete *piers.* BECK's theory as to the cause of the bridge collapse is that the wooden *pilings* which supported the concrete piers failed as a result of damage caused by the 1964 earthquake. *See* note 4 *supra.*

included in the bid package,[8] and the contractor, therefore, did not actually "have access to the same information as the State," there is no indication that the information was pertinent to demolition of the bridge. We conclude that the statement in question did not misrepresent the extent of the State's knowledge concerning the bridge.

Considering the context in which the two statements were made and considering the contract's clear statement that Bridge 331 was "a damaged . . . structure," we conclude that there was no misrepresentation.

## II. Breach of Implied Warranty

■ BECK's second theory of liability is that the State breached an implied warranty that Bridge 331 was suitable for use as a means of access. The superior court found that there was no warranty. The basis for that finding was the fact that use of the old bridge for access was not contemplated by the terms of the contract.[9] We agree with the superior court.

Our decision in *A.R.C. Industries, Inc. v. State*, 551 P.2d 951 (Alaska 1976), supports this conclusion. That case involved a contractor's claim for additional costs incurred when a weir collapsed during construction. The trial court found that the plans and specifications did not specify the method of closing the weir and that the collapse was caused by the closure method selected by the contractor. *Id.* at 956. We held that there was no misrepresentation and no breach of implied warranty:

> Since the plans and specifications provided by the state were silent on the matter of closure, and since A.R.C., alone, selected the location and method of closure, it would not appear that the state breached

even an implied warranty. In leaving closure to the contractor, there were no misrepresentations made to A.R.C. by the state.

*Id.* at 960. The factual analogy to the case at bar is obvious: BECK was not required by the contract to use old Bridge 331 as access, and BECK could have chosen some other means of access.

*A.R.C.*, however, can be distinguished. In that case there was no indication that the State in fact expected the contractor to use any particular method of closure. In the case at bar, on the other hand, there is substantial, undisputed evidence that the State's design of the new bridge project was premised on the use of the old bridge for access. The record includes many statements by State personnel which indicate that the use of the old bridge for access would greatly reduce the cost of the project. The statements reveal that use of the old bridge was an underlying assumption of the project. Although the Federal Highway Administration questioned that assumption and suggested that the costs for access by barge should be added to the cost estimate for the project, there is no indication that the State ever contemplated a project that did not rely on the reduced cost made possible by use of the old bridge. We conclude, however, that the State's assumption that the contractor would use the old bridge for access did not give rise to an implied warranty of the bridge's suitability for such use.

Our conclusion is supported by *Chris Berg, Inc. v. United States*, 389 F.2d 401, 182 Ct.Cl. 23 (1968). That case involved a government contract for the construction of a new tramway, parallel to the old tramway, at a remote Air Force radar site at

---

**8.** *See* note 12 and accompanying text *infra*.

**9.** The pertinent portion of the superior court's Memorandum of Decision reads as follows:

> These materials admit of only one interpretation as to what the contract intended with respect to the railroad bridge. This is that plaintiff, as successful bidder, was required to remove the bridge as a part of the project, and any representations concerning it were directed solely to the responsibilities connect-

ed with that task. That defendant became aware, upon award of the contract to this bidder, that the bridge might be used for access to the site of the new construction, is not material. This consideration was no part of the basis of the bargain struck between the parties. There is nothing in the bid specifications or other contract documents to suggest any representations as to the suitability of the old bridge for access purposes.

Cape Newenham, Alaska. The contract included the following provision: "The existing towers and tramway may be used in erecting the new towers and tramway."[10] In fact, however, the old tramway proved to be too deteriorated for safe use, and the contractor had to move the components of the new tower into place by other, more expensive methods. *Id.* at 403–04. When the contractor appealed the administrative denial of its claim for extra costs, the court held that the contract language "may be used" referred only to "permissive use and not to any specific suitable or intended use." *Id.* at 405. Thus, even though the contract explicitly authorized the use of the old tramway, the government was found not to have warranted its suitability for the authorized use. In the case at bar there is even less of a basis for finding a warranty, since the contract terms do not contemplate even the permissive use of the old bridge for access. We therefore conclude that there was no implied warranty.[11]

### III. Breach of Duty to Disclose Superior Knowledge

BECK's third theory of liability is that the State breached a duty to disclose all of its information about old Bridge 331. Specifically, BECK contends that the State had a duty to disclose various reports that were compiled by the Department of Highways following the 1964 earthquake evaluating the extent of damage suffered by the bridge.[12] The superior court found that the State's failure to disclose information which it had about old Bridge 331 did not give rise to liability because the State did not have any "superior knowledge" about the bridge. We agree.

Under our holding in *Morrison-Knudsen Co. v. State,* 519 P.2d 834 (Alaska 1974), the State had no duty to disclose the earthquake damage reports. *Morrison-Knudsen* involved a contractor's claim for extra costs in connection with the construction of the airport in Sitka, Alaska. Although the bid documents had included a drawing indicating that certain underwater areas were "Areas Proven Suitable For Dredging," the areas in fact proved unsuitable, and the contractor was forced to obtain fill material from a distant site and haul it by barge to the construction site. *Id.* at 836–38. On appeal we held that, although the State had

---

10. The clause also provided: "The contractor assumes all liability in the use of the existing tramway for erection purposes." 389 F.2d at 404. In a companion case to *Chris Berg* the court concluded that this sentence referred only to liability to third parties and that it did not pertain to liabilities of the contracting parties to one another. *S. S. Mullen, Inc. v. United States,* 389 F.2d 390, 182 Ct.Cl. 1 (1968).

11. While we affirm the superior court's finding in favor of the State on this issue, we note that it would have been preferable if the parties had included explicit terms on means of access in the contract. Given the peculiar difficulties of access to construction sites in Alaska and the litigation that continues to arise from access-related disputes, we strongly encourage the State and the construction industry to explicitly deal with potential access problems in their contracts. For other cases involving access to construction sites, *see Northern Corp. v. Chugach Electric Assoc.,* 523 P.2d 1243 (Alaska 1974); *Merl F. Thomas Sons, Inc. v. State,* 396 P.2d 76 (Alaska 1964).

12. A report dated April 10, 1964, prepared by a state bridge engineer commented on Bridge 331 in part as follows:

This huge structure was severely damaged by the earthquake and, for all practical purposes, is impassable.

The entire bridge shows signs of being violently shaken. The massive concrete piers and abutments appear to have sustained no damage, whereas the 3-rail trestle bents are severely damaged.

A report by another state engineer, dated April 24, 1964, included the following notation on Bridge 331: "Bearings shifted, truss rollernest tipped over, concrete pedestal on Pier # 4 broken, 3-rail piles broken on many piers." A more detailed report by the same engineer, dated July 13, 1964, commented on Bridge 331 in part as follows:

This structure has been subjected to severe shaking and some gross movements. All of the short trestle spans have been subjected to considerable stress and movement, and it would be false economy to attempt to utilize any of the pile bents for reconstruction. As mentioned in the introduction to this section, the total extent of damage to these piles is difficult if not impossible to assess.

Other reports contained detailed recommendations on anticipated repair work to the bridge.

learned prior to letting the contract that the designated dredging site was unsuitable, it had no duty to disclose that information to bidders. We reached that conclusion because the information which the State had about the quality of the fill material was equally available to the contractor. In fact, the State had learned of the unsuitability of the material from two other bidders, one of whom had simply inspected the site from a boat.

In *Morrison-Knudsen*, relying on a series of Court of Claims cases, we established the following test to determine when the State has a duty to disclose information to a contractor:

> [D]id the state occupy so uniquely-favored a position with regard to the information at issue that no ordinary bidder in the plaintiff's position could reasonably acquire that information without resort to the State? Where resort to the state is the only reasonable avenue for acquiring the information, the state must disclose it, and may not claim as a defense either the contractor's failure to make an independent request or exculpatory language in the contract documents.

519 P.2d at 841.

The earthquake damage reports which BECK contends the State should have disclosed were all based on information obtained by simple visual inspection of the bridge. One report, for example, was based on a one-day inspection trip during which the engineer inspected approximately thirty-eight bridges. Since BECK could easily have obtained the information included in the reports by having an engineer inspect the bridge, the State was under no duty to disclose the information.

### IV. Attorney's Fees

The final judgment of the superior court included an award to the State of $23,000 in costs and attorney's fees. *See* Rules 79 &

80, Alaska R.Civ.P. The $23,000 represents $11,700, which was originally allowed for costs and fees for the State's private counsel, plus $11,300 which was subsequently allowed as a fee for staff of the attorney general's office who participated in the case.[13]

On appeal BECK challenges the superior court's award of attorney's fees. BECK contends that our holding in *Continental Insurance Co. v. United States Fidelity & Guaranty Co.*, 552 P.2d 1122 (Alaska 1976), disallowing fees for in-house counsel, precludes an award for work performed by staff of the attorney general's office. The State on the other hand contends that the more recent decision in *Greater Anchorage Area Borough v. Sisters of Charity*, 573 P.2d 862 (Alaska 1978), allowing an award for work performed by the borough's legal staff, is authority for making an award for work performed by the attorney general's office. In *Sisters of Charity* we commented on our holding in *Continental*: "We [do] not intend to express a prohibition against awarding attorney's fees when a party's active representation in litigation is by in-house counsel rather than retained counsel." 573 P.2d at 863. We now hold that, where a party is represented by both private counsel and in-house counsel who actively participate in the preparation of the case, the party may recover partial fees for both private and in-house counsel.[14] The superior court's award of attorney's fees is therefore affirmed.

AFFIRMED.

---

**13.** The attorney's fees requested were $41,825.00 on behalf of the Attorney General's Office and $16,662.50 on behalf of private counsel. The court apparently reduced the Attorney General's fee to the amount of time involved in actual litigation and awarded partial attorney's fees for the time expended by the

Attorney General's Office and private counsel in accordance with our decision in *Malvo v. J. C. Penney Co.*, 512 P.2d 575 (Alaska 1973).

**14.** *See Malvo v. J. C. Penney Co.*, 512 P.2d 575 (Alaska 1973).