Michael R. HAYES, Appellant,

v.

BERING SEA REINDEER PRODUCTS, and Will Sherman, Appellees.

No. S–8452.

Supreme Court of Alaska.

Aug. 20, 1999.

Robert S. Spitzfaden, Gruening & Spitzfaden, APC, Juneau, for Appellant.

James A. Bowen, Juneau, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

North Coast Industries (NCI) contracted to purchase an aircraft from Bering Sea Reindeer Products but stopped making payments because the aircraft was defective. Bering Sea successfully sued NCI and its partners, including Michael Hayes, for breach of contract. Michael Hayes appeals on various grounds. Because he fails to demonstrate prejudicial substantive or procedural error, we affirm the judgment against him.

## II.  FACTS AND PROCEEDINGS

NCI contracted to purchase a Beechcraft E–18 aircraft for $73,000 from Bering Sea, a tribal enterprise established by the Native Village of Mekoryuk.  NCI intended to use the aircraft for commercial purposes.  NCI claimed that after it made the $25,000 down payment and took possession, it discovered that the aircraft would require extensive repairs before it would pass Federal Aviation Administration (FAA) inspection.  It made no further payments on the purchase price.

Bering Sea sued brothers Arthur and Michael Hayes individually and in their capacity as partners in NCI. Michael was then working on the Aleutian chain and communicated infrequently with his brother in Juneau. When Michael found out that Bering Sea had filed suit, he assumed that his brother would defend the litigation.  Arthur retained a defense attorney, but the attorney withdrew shortly before the trial was to begin because Arthur could not pay his fees.  As a consequence, NCI and Arthur failed to defend against Bering Sea's claims.  The court entered default judgment against NCI and Arthur but granted Michael's request for a continuance so he could obtain counsel and contest the claims against him.

Michael asserted defenses to Bering Sea's breach of contract claim and counterclaimed for breach of contract and misrepresentation.  Michael also filed a third-party claim of misrepresentation against Bering Sea's representative, Will Sherman.  The court dismissed his counterclaims on summary judgment because it had previously determined that sovereign immunity barred similar claims asserted against Bering Sea by NCI and Arthur.

After a bench trial on Bering Sea's claims against Michael and Michael's claim against Sherman, the trial court entered judgment against Michael on all claims.  It also ruled that Michael was liable to Bering Sea as a result of the prior judgment against NCI and Arthur.  Michael appeals from the portion of the judgment based on the trial; he does not appeal from the default judgment entered against NCI.

## III.  DISCUSSION

### A.  Standard of Review

We review questions of law de novo.[1]  We uphold a grant of summary judgment only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[2]

We review findings of fact for clear error giving due regard to the trial court's opportunity to judge the credibility of the witnesses.[3]  Although we independently review a trial court's interpretation of a written contract when it is based exclusively on documentary evidence, we apply the clearly erroneous standard when it is based on extrinsic testimonial evidence.[4]

We review a trial court's award of attorney's fees for an abuse of discretion.[5]

### B.  Failure to Demonstrate Prejudice

Michael advances a variety of arguments why the trial court erred in entering judgment against him after trial.  They relate to the effect of the alleged deficiencies in the aircraft, the efficacy of disclaimer language in the contract, and the failure to deliver a bill of sale satisfying FAA standards for proof of ownership.  Bering Sea contends that we need not reach these issues because under the doctrine of res judicata the default judgment against NCI precludes Michael from relitigating his contractual liability to Bering Sea. Although our analysis is somewhat different from Bering Sea's, we

---

1.  See *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

2.  See *Mount Juneau Enters. v. City of Juneau*, 923 P.2d 768, 772–73 (Alaska 1996).

3.  See Alaska R. Civ. P. 52(a); *see also Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 121–22 (Alaska 1991).

4.  See *Klosterman*, 821 P.2d at 122.

5.  See *McNett v. Alyeska Pipeline Serv. Co.*, 856 P.2d 1165, 1167 (Alaska 1993).

agree that the default judgment is dispositive of Michael's liability to Bering Sea.[6]

■ Because Michael has not demonstrated that the judgment against him caused him harm, he is not entitled to relief from the judgment on appeal. We will not disturb or modify a judicial determination absent a demonstration of both error and prejudice.[7]

■ We reason as follows. Michael was a partner in NCI, and is therefore jointly and severally liable to Bering Sea on Bering Sea's judgment against NCI. Under partnership law, all partners are jointly liable for the debts and obligations of the partnership.[8] The superior court found that Michael was a partner at all relevant times. He has not contested this finding on appeal, he has not sought to set aside the default judgment against NCI, and he has not claimed that he cannot be liable for the debts of NCI.

■ Because the judgment entered against Michael after trial imposed no additional liability against him beyond that established by the default judgment—each judgment awarded Bering Sea contract damages of approximately $53,000—the portion of the judgment from which Michael appeals did not harm him. Bering Sea can only recover once on the amount Arthur, Michael, and NCI jointly and severally owe as a result of the default judgment against NCI. Michael could avoid liability only if the default judgment were also reversed. By the same token, reversal of the judgment against Michael would not benefit him. Michael argues, in responding to Bering Sea's res judicata argument, that the trial court could not

have intended the default judgment against NCI to bind Michael, because the court entered the default judgment against NCI without prejudice to Michael and then allowed Michael to defend himself at trial by raising the warranty issues. He argues that it is significant that the court did not limit him to litigating his partnership status. But it appears the trial court was not attempting to preserve Michael's ability to contest the default judgment against NCI. When it entered judgment against NCI on October 30, 1996, the court stated:

> IT IS FURTHER ORDERED that nothing herein in any way prejudices [Bering Sea] from pursuing its contract and tort claims against defendant Michael Hayes, and seeking a judgment against him which includes the above.

The claims Bering Sea then tried against Michael included additional tort claims for fraud. Thus, the court included this language not to protect Michael, but to preserve Bering Sea's additional claims against Michael. And when it entered final judgment in November 1997, the trial court ruled consistently that Michael "was at all relevant times a partner of NCI. As such, in addition to his liability set forth below, he is liable under this Court's October 30, 1996, judgment in favor of Bering Sea and against Arthur D. Hayes and NCI."

Michael argues that res judicata does not apply to the default judgment because it was not a final judgment. Under Alaska Civil Rule 54(b), a judgment involving multiple parties is presumed not to be final unless expressly designated final by the court.[9] Al-

---

6. We may uphold a trial court's decision on an alternate legal theory. *See Demoski v. New,* 737 P.2d 780, 786 (Alaska 1987); *cf. Wright v. State,* 824 P.2d 718, 720 (Alaska 1992). Bering Sea has not targeted Michael's failure to demonstrate prejudice. But its appellate brief recites and analyzes all facts salient to our analysis. In arguing that Michael's judgment was barred by res judicata, Bering Sea gave Michael sufficient opportunity, and the need, to raise any relevant facts or theories in rebuttal.

7. *See* Alaska R. Civ. P. 61; *see also Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 722 (Alaska 1975) (holding that appellant bears burden of proving prejudice as well as error), *modified on other grounds by* 552 P.2d 157 (Alaska 1976).

8. *See* AS 32.05.100; *Bradford v. First Nat'l Bank of Anchorage,* 932 P.2d 256, 264 (Alaska 1997).

9. Alaska Civil Rule 54(b) provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabili-

though Michael is correct in stating that the October 1996 judgment was not a final judgment, the court subsequently entered final judgment against NCI in November 1997. NCI did not appeal from that judgment, nor did Michael establish any reason he should not be bound by that judgment. Thus, we decline to consider Michael's defenses to breach of contract.

## C. *Counterclaims*

We turn to Michael's counterclaims against Bering Sea for breach of contract. Bering Sea argues that Michael's counterclaims are barred by sovereign immunity. Michael argues that Bering Sea waived any claim of immunity by entering into the contract with Michael and through a "sue and be sued" clause in its corporate charter.

■ Absent clear waiver by the tribe or Congressional abrogation, suits against Indian tribes are barred by sovereign immunity.[10] This immunity extends to cross-claims and counterclaims.[11] Any such waiver must be clear and explicit.[12]

Before Michael obtained separate counsel, Arthur and NCI counterclaimed against Bering Sea for breach of contract and misrepresentation. Bering Sea moved for partial summary judgment, contending that the claims were barred by sovereign immunity. Defendants did not oppose this motion, and the superior court granted it.

After obtaining a continuance, Michael filed a motion asking the court to rule that Bering Sea had waived its immunity. Viewing Michael's motion as an untimely motion for reconsideration of a previously decided issue, the court denied it. The court also declined to revisit the issue based on the doctrine of the law of the case.

Because we conclude that Michael's counterclaims are meritless, we need not consider the procedural and substantive merits of the court's rulings on sovereign immunity.

### 1. *Express warranties*

Michael contends that Bering Sea made and breached express warranties; Bering Sea counters that it explicitly disclaimed all express and implied warranties. The trial court held that Bering Sea made no warranty concerning the condition of the aircraft at the time of sale because Bering Sea expressly disavowed any warranty in the contract of sale.

Michael argues that Bering Sea. made three express warranties during the sale negotiation. He first claims that Bering Sea made an express warranty about the aircraft's airworthiness by presenting its airworthiness certificate to NCI before the sale. Michael next contends that Will Sherman, a representative of Bering Sea, created an express warranty when he assured NCI that the aircraft would meet FAA standards and that it would easily pass inspection. Michael last asserts that Bering Sea made an express warranty that the aircraft would conform to a description Bering Sea faxed to NCI. He claims there were numerous disparities and defects, particularly in the radios, avionics systems, and anti-icing systems.

Denying that it made any express warranties, Bering Sea also argues that it disclaimed any express warranties it arguably made. The contract included the following disclaimer:

> Prior to entering into this agreement, buyer agrees that he has had ample opportunity to inspect aircraft and its logs, and acknowledges that he is purchasing air-

---

ties of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

**10.** *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

**11.** *See United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940).

**12.** *See Blatchford v. Native Village of Noatak,* 501 U.S. 775, 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); *Parker Drilling Co. v. Metlakatla Indian Community,* 451 F.Supp. 1127, 1136 (D.Alaska 1978).

craft with no warranty, either express or implied, as to the condition of the aircraft or its components.

Seller states that they have in no way misrepresented the aircraft, its condition, and equipment, and have allowed buyer to make any reasonable "pre-buying" inspections of the aircraft. Seller further states that to the best of their knowledge the aircraft is being delivered in an airworthy condition.

▉ We assume for the sake of discussion that, but for the disclaimer and the thorough pre-sale inspection opportunity, Bering Sea's actions could have created express warranties regarding the aircraft's condition. A description of the item to be sold [13] or promise regarding its condition [14] can create an express warranty under the Uniform Commercial Code as long as it forms part of the basis of the bargain. Such descriptions need not be verbal; technical specifications [15] or documents such as airworthiness certificates [16] can create warranties.

▉ But we are not convinced that these representations formed part of the basis of the parties' bargain, or that the trial court erred in concluding that Bering Sea made no warranty concerning the condition of the aircraft "as of the time of sale." The court found that NCI's representative had inspected the aircraft over a two-day period. The evidence about the extent and results of this pre-sale inspection is not materially disputed.

Bering Sea offered NCI ample opportunity to inspect the aircraft, and NCI fully exercised this opportunity before it entered into the contract. A qualified airframe and powerplant mechanic selected by NCI inspected the aircraft on December 16 and 17, 1994. He observed numerous discrepancies between the faxed description and the actual condition of the aircraft and its components. He reported to Arthur Hayes· his opinions concerning the condition of the aircraft and whether it could pass an FAA inspection. As a result of problems the mechanic perceived in the propellers during his inspection, NCI negotiated a lower purchase price.

Two days after completion of the inspection, NCI and Bering Sea entered into the contract on December 19. The first paragraph of the disclaimer refers to the inspection. This paragraph permits a conclusion that the inspection, not the prior fax or conversation with Sherman, formed the basis for NCI's understanding of the aircraft's condition. It also supports the trial court's conclusion that Bering Sea, at the time of sale, made no warranty of condition.·

We are guided by our reasoning in *B–E–C–K Constructors v. State, Department of Highways*.[17] We there held that the State made no implied warranty to a contractor regarding the soundness of a bridge because any representations the State made were not part of the basis of the bargain.[18] The bridge eventually collapsed. Although the State knew that BECK intended to use the

---

13. AS 45.02.313 provides in relevant part:

(a) Express warranties by the seller are created as follows:
. . . .
(2) a description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description;
. . . .
(b) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion of commendation of the goods does not create a warranty.

14. AS 45.02.313(a)(1) provides: "an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of

the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

15. *See* U.C.C. § 2–313 cmt. 5 ("A description need not be by words. Technical specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them.").

16. *See Limited Flying Club, Inc. v. Wood*, 632 F.2d 51, 55–57 (8th Cir.1980) (holding that seller's presentation of aircraft logbook, including airworthiness certificates, created express warranty under provision of Iowa's version of U.C.C. identical to Alaska's).

17. 604 P.2d 578, 583 (Alaska 1979).

18. *See id.* at 583 n. 9.

bridge in completing its project, the contract made no representations as to the bridge's suitability for this use, the contract specified that BECK would destroy the bridge upon completion of the project, and the State explicitly disclaimed any warranty regarding the bridge's condition based on sixty-year-old engineering plans it provided BECK.[19]

■ A seller cannot negate express warranties through generalized disclaimers.[20] But the clear, forceful, specific disclaimer in this contract defeats Michael's claim that Bering Sea made any enforceable express warranty. This is not a fine-print boilerplate disclaimer which NCI could not have negotiated or understood; it is a conspicuous, clearly written provision in a two-page contract between parties with equal bargaining power. Its recitation that the "buyer ... had ample opportunity to inspect [the] aircraft and its logs" is not a mere formalism, but reflects NCI's actual conduct. We therefore conclude that it was both an enforceable disclaimer and evidence of the basis of the parties' bargain. The numerous discrepancies the mechanic observed and the clear language of the disclaimer could not have left NCI with any illusions that Bering Sea was warranting the aircraft's condition. We therefore affirm the trial court's conclusion that Bering Sea "made no warranty concerning the condition of the subject aircraft as of the time of sale."

### 2. *Warranty of title*

Michael argues that Bering Sea breached its warranty of title. Alaska Statute 45.02.312 requires sellers to provide buyers with proper title.[21]

Due to a defect in the bill of sale, the FAA refused to register the aircraft. Ted Moses, who represented Bering Sea, signed the bill of sale as "Ted Moses—COO [chief operating officer]" rather than as "Bering Sea Reindeer Products, by Ted Moses, its COO." NCI asked Moses to remedy the defect by correctly completing another form. Although Moses agreed to do so, he did not prepare a corrected bill of sale before his untimely death about a year later. Bering Sea contends that any harm caused by the defect was *de minimis* because the FAA would have accepted some document other than a bill of sale as proof of ownership.

■ The superior court found that the formal defect in title did not harm NCI. It reasoned that because NCI was unable to obtain FAA permission to operate the aircraft due to its poor mechanical condition, NCI would have been unable to obtain certification, with or without proper title. The court based this conclusion partly on NCI's failure to pursue the matter with the FAA. The court noted that NCI made no effort to "resolve the title problem" with the FAA after the aircraft's temporary registration expired "because the mechanical problems it was experiencing with the aircraft made the title matter irrelevant." We agree with this analysis, and reject Michael's argument that Bering Sea breached its duty to provide proper title. Accordingly, the court also properly denied relief under Alaska Civil Rule 41(b) based on the same argument.[22]

### D. *Misrepresentation*

Michael also challenges the superior court's dismissal of his claim against Bering

---

19. *See id.* at 580–84.

20. AS 45.02.316(a) provides:
   Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed where reasonable as consistent with each other; but subject to the provisions on parol or extrinsic evidence (AS 45.02.202) negation or limitation is inoperative to the extent that such construction is unreasonable.
   U.C.C. § 2–316 cmt. 1 states:
   This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express

or implied." It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty....

21. AS 45.02.312(a) provides that "there is in a contract for sale a warranty by the seller that (1) the title conveyed shall be good, and its transfer rightful."

22. *See* Alaska R. Civ. P. 41(b) (providing for involuntary dismissal of actions).

Sea's agent, Will Sherman.[23] He argues that Sherman misrepresented the condition of the aircraft by assuring him that it would pass FAA inspection and was useable for a freight transport contract with United Parcel Service.

■ The superior court made no factual findings regarding the content of Sherman's statements. Instead, it dismissed this claim, reasoning that the express disclaimer in the contract shielded Sherman from liability. We agree with the superior court's conclusion that Michael's claims must fail, whether or not Sherman made the assurances described by Michael.

Michael alleges that Sherman committed the torts of innocent, negligent, and fraudulent misrepresentation. To prevail on any such claim, Michael would have to demonstrate that he relied on Sherman's representations when NCI purchased the aircraft.[24] Because any representations Sherman may have made were not part of the bargain, as discussed above in Part III.C.1, Michael could not reasonably have relied on them. Therefore, the court did not err in dismissing Michael's claim.

### E. Interest Calculation and Attorney's Fees

Michael argues that the superior court erred in imposing a statutory rate of interest, rather than the rate specified in the contract, on the award against him. He also challenges Bering Sea's attorney's fee award because it was based in part on the prejudgment interest award.

■ An award for the payment of money is subject to prejudgment interest at the statutory rate unless the award is based on a contract specifying a different rate. The version of AS 09.30.070(a) in effect when the parties entered into the contract provided:

> Interest on judgments; prejudgment interest. (a) The rate of interest on judgments and decrees for the payment of money is 10.5 percent a year, except that a judgment or decree founded on a contract in writing, providing for the payment of interest until paid at a specified rate not exceeding the legal rate of interest for that type of contract, bears interest at the rate specified in the contract if the interest rate is set out in the judgment or decree.[25]

Although the judgment noted that the contract specified a 9% interest rate, the court applied a 10.5% prejudgment rate to the damage award of $53,675. We conclude that the exception for contract-specified interest rates applies here: the damage award was based on a written contract that provided for payment of interest at a specified and legally permissible rate, and the rate was set out in the judgment.[26] The prejudgment interest should have been calculated at the 9% rate specified in the contract.

■ But the error did not prejudice Michael. The superior court applied a 10.5% prejudgment interest rate to the default judgment. Michael has not challenged use of this rate in the default judgment against Arthur and NCI. Thus, he has effectively waived any right to challenge use of this rate in the judgment against him, and any error is harmless. Accordingly, we affirm the court's calculation of prejudgment interest and the attorney's fee calculation based on that interest.

---

**23.** Although he asserted a counterclaim of misrepresentation against Bering Sea in the superior court, Michael does not assert on appeal that Bering Sea should be liable for Sherman's representations. We note that any such claim would necessarily fail for the same reasons that his claim against Sherman fails.

**24.** See Barber v. National Bank of Alaska, 815 P.2d 857, 862–63 (Alaska 1991) (upholding dismissal of fraudulent and negligent representation claims based on failure to demonstrate reliance); Bevins v. Ballard, 655 P.2d 757, 761–62 (Alaska 1982) (stating that reliance is element of prima facie claim of innocent misrepresentation).

**25.** AS 09.30.070(a) (1994), amended by ch. 26 § 18, SLA 1997. The current version retains the exception for contractually specified interest rates. See AS 09.30.070(a) (1998).

**26.** See Riley v. Northern Commercial Co., 648 P.2d 961, 968 (Alaska 1982) (interest rate specified by promissory note, rather than statutory rate, governed prejudgment and post-judgment interest calculations).

IV. *CONCLUSION*

We AFFIRM the judgment.

CARPENETI, Justice, not participating.